CHEMICAL MANUFACTURERS
ASSOCIATION, et al.,
Plaintiffs,

v.

ENVIRONMENTAL PROTECTION
AGENCY, et al., Defendants,

and

American Communities For Cleanup
Equity, et al., Defendants–
Intervenors.

No. CIV. A. 98–1255–LFO.

United States District Court,
District of Columbia.

Nov. 16, 1998.

Michael W. Steinberg, Joshua D. Sarnoff, Morgan, Lewis & Bockius LLP, Washington, DC, for Plaintiffs.

David F. Zoll, Alexandra Dapolito Dunn, Chemical Mfrs. Ass'n, Arlington, VA, for Plaintiff Chemical Mfrs. Ass'n.

Phillip D. Brady, General Counsel, Julie C. Becker, Senior Atty., American Automobile Mfrs. Ass'n, Washington, DC, for Plaintiff American Automobile Mfrs. Ass'n.

G. William Frick, Susan M. Schmedes, American Petroleum Inst., Washington, DC, for Plaintiff American Petroleum Inst.

David Isaacs, Director of Envt'l Aff. and Deputy General Counsel, Electronic Industries Alliance, Arlington, VA, for Plaintiff Electronic Industries Alliance.

Jan Amundson, General Counsel, National Association of Manufacturers, Washington, DC, for Plaintiff Nat. Ass'n of Mfrs.

Robin S. Conrad, National Chamber Litigation Center, Washington, DC, for Plaintiff Chamber of Commerce of U.S.

Martin F. McDermott, Eric G. Hostetler, Jackie Wilson, U.S. Dept. of Justice, Environment & Nat. Resources Div., Environmental Defense Section, Washington, DC, Lisa K. Friedman, Alexander Schmandt, Office of General Counsel, U.S. Environmental Protection Agency, Washington, DC, for Defendant U.S.E.P.A.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs, five trade associations and the U.S. Chamber of Commerce, challenge an Environmental Protection Agency ("EPA") document, published in the Federal Register, that concerns settlements at municipal solid waste co-disposal sites. Pending for consideration is defendants' motion to dismiss for lack of subject matter jurisdiction, non-justiciability, and failure to state a claim upon which relief can be granted. *See* Fed. R.Civ.P. 12(b)(1), (6). Defendants' motion has been opposed by plaintiffs, and supported by intervenors. A hearing was held on November 6, 1998. For the reasons stated herein, defendants' motion is granted.

I.

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") crafts a scheme for cleaning up releases or threatened releases of hazardous substances at Superfund sites. 42 U.S.C. §§ 9601–9675. The statute imposes liability on four categories of parties: 1) current owners or operators of the disposal facility; 2) owners or operators of the facility at the time of disposal of hazardous substances; 3) persons who arranged for disposal of hazardous substances at a facility ("generators"); and 4) persons who accept or accepted any hazardous substances for transport to the sites ("transporters"). 42 U.S.C. § 9607(a). The statute permits parties to initiate legal actions to "seek contribution from any other person who is liable or potentially liable" under the Act. 42 U.S.C. § 9613(f)(1).

Pursuant to CERCLA, EPA, through a delegation from the President, has several options for undertaking a cleanup of a disposal site, including negotiating settlements with responsible parties. *See* 42 U.S.C. § 9622. A party that "has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2); *see also* 42 U.S.C. §§ 9622(g)(5), (h)(4). The document at issue in this case articulates principles for EPA to implement when negotiating settlements with generators and transporters of municipal solid waste, and with municipal owners and operators of co-disposal facilities. *See* Policy for Municipality and Municipal Solid Waste; CERCLA Settlements at NPL Co–Disposal Sites, 63 Fed.Reg. 8197 (1998) ("settlement policy"). Styled as a policy, the document sets out certain numerical figures for settlements with such parties: For example, with respect to generators and transporters, the policy identifies $5.30 per ton of waste contributed as the desired rate to charge; for owners and operators, the policy sets 20% to 35% of the site's estimated total cleanup costs as the desired rate. 63 Fed. Reg. at 8199.

Plaintiffs contend in their complaint that these numerical figures are "rigid" standards from which EPA may not deviate in brokering settlements with potentially liable parties. Compl. at 2. They claim that such limits ignore the facts and equitable considerations peculiar to individual disposal sites, and therefore increase the liability of all other potentially liable parties. *Id.* Plaintiffs' specific legal contentions are that the settlement policy is final agency action that is arbitrary and capricious, that conflicts with CERCLA, and that is beyond the authority of EPA. *Id.* at 13–14. They seek, *inter alia*, a declaration that the policy is unlawful and a permanent injunction to prevent EPA from relying on the settlement policy in future negotiations.

## II.

Defendants advance three grounds for their motion to dismiss. First, they claim that subject matter jurisdiction is lacking because the settlement policy is not final agency action, and therefore not reviewable. Mot. to Dismiss at 1. Second, defendants argue that this case is not justiciable because the settlement policy is not ripe for review. *Id.* at 1–2. Finally, defendants submit that plaintiffs have failed to state a claim upon which relief can be granted with respect to their argument that EPA failed to use "reasoned decisionmaking" in developing the settlement policy. *Id.* at 27–28.

## A.

■ Section 704 of the Administrative Procedure Act establishes that unless otherwise provided by statute, only "final agency action" is subject to judicial review. 5 U.S.C. § 704.[1] To meet the finality requirement, agency action "must mark the consummation of the agency's decisionmaking process," and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997) (citations and internal quotation marks omitted). Plaintiffs have not demonstrated that the settlement policy satisfies this conjunctive standard.

## 1.

■ Defendants argue that the settlement policy does not "mark the consummation" of EPA's decisionmaking process because it "expressly does not commit EPA to enter into any particular settlement with any party," and does not require "EPA to apply the policy's presumptive settlement approach when it does exercise its enforcement discretion to enter into settlements." Mot. to Dismiss at 16. Also, EPA submits that if it "does elect to enter into any settlements consistent with or shaped by the policy, adversely affected parties will have an opportu-

---

1. 42 U.S.C. § 9613(a) authorizes judicial review, by the D.C. Circuit, of "any regulation promulgated" pursuant to CERCLA, but there is no allegation here that the settlement policy is a "regulation" within the meaning of § 9613(a). Plaintiffs do not contend that judicial review is explicitly authorized by any other statute.

nity to contest the policy's application in a concrete setting," as settlements "guided by the policy are subject to public notice and comment" and to judicial review. *Id.* Defendants' argument is supported both by the plain language of the settlement policy and governing caselaw.

First, the policy asserts that it is intended to guide future settlements, not bind them. *See* 63 Fed.Reg. at 8201 (policy is "intended exclusively as guidance for employees of the U.S. Government"). Further, the policy repeatedly invokes situations in which the principles articulated in the policy will not be applied to particular sites and parties—for example, when "the resulting settlement would not be fair, reasonable, or in the public interest," *id.* at 8200, or when "application of th[e] policy would be inequitable." *Id.* at 8198. On its face, the policy also grants EPA considerable discretion to deviate from the policy's baseline figures. *See id.* at 8200. This clear language establishes that the settlement policy represents an interim point in the agency's decisionmaking process; only when it decides *whether* and *how* to apply the policy's principles to a specific disposal site and the parties involved will the agency conclude such process.[2]

That the settlement policy does not "mark the consummation" of EPA's decisionmaking process is confirmed by the analysis applied in relevant caselaw. For example, in *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Supreme Court considered a Biological Opinion issued by the Fish and Wildlife Service for the Bureau of Reclamation. The Opinion assessed the likely impact on certain endangered species of action proposed by the Bureau. The Court held that issuance of the Opinion marked the consummation of the Service's decisionmaking process, but only because it transmitted the Opinion to the Bureau—in the context of a particular case—and took no further action, *id.* 117 S.Ct. at 1159; by definition, issuance of the Opinion *concluded* the Service's involvement. The instant case stands in stark contrast to *Bennett.* The settlement policy does not conclude EPA's involvement with any particular case, and it does not represent one agency's final declaration about the legality of action proposed by a separate agency. Thus, unlike the Biological Opinion in *Bennett,* which marked a consummation point, the settlement policy is a starting point that states principles intended to guide *future* agency action. The authoritative reasoning used in *Bennett* therefore establishes that the settlement policy does not meet the first prong of final agency action. *Cf. Franklin v. Massachusetts,* 505 U.S. 788, 798, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (holding that Commerce Secretary's presentation to the President of a report tabulating the results of the decennial census was not final agency action, as it was "more like a tentative recommendation than a final and binding determination.").

This conclusion is buttressed by our court of appeals' decision in *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33 (D.C.Cir.1974). Before the court in that case was an order issued by the Commission setting forth its view of a proper priority schedule for curtailment of natural gas supplies during periods of shortage. *Id.* at 36. The order announced the Commission's "intent to follow th[e] priority schedule unless a particular pipeline company demonstrate[d] that a curtailment plan [wa]s more in the public interest," *id.,* prompting the court to conclude that it was a general statement of policy that was not final agency action. *Id.* at 40. The court highlighted the order's statement that it was to "serve as a guide in other proceedings," and emphasized that the order did "not establish a curtailment plan for any particular pipeline." *Id.* The features that proved dispositive in *Pacific Gas & Electric* are present here: The settlement policy is explicit that it is meant solely as

---

**2.** Plaintiffs contend that the settlement policy marks the consummation of the agency's decisionmaking process because it supplements an earlier interim policy and because it represents EPA's "final position." Opp. at 11. A logical reading of *Bennett v. Spear,* however, suggests that the relevant question is not whether the action concludes *a* decisionmaking process— such as what a policy published in the Federal Register is to contain—but whether the action concludes *the* decisionmaking process—that is, a broader process that impacts individual parties and their rights and obligations.

guidance for future action, and it is clear that the policy does "not establish a [settlement] for any particular" disposal site or party. *Id.* Accordingly, like the order in *Pacific Gas & Electric,* the settlement policy does not mark the consummation of EPA's decisionmaking process, and therefore is not final agency action.

Plaintiffs attempt to undercut this conclusion with citation to several decisions by our court of appeals, but none is availing. For example, in *Natural Resources Defense Council, Inc. v. EPA,* 22 F.3d 1125 (D.C.Cir. 1994), the court held that EPA undertook final action when, in the course of implementing the 1990 Amendments to the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.,* it "authoriz[ed] conditional approval of [state] 'committal' submissions," *id.* at 1132–33—action that "postponed the submission of substantive [state implementation plans] beyond the congressionally mandated deadline." *Id.* at 1133. Essential to the court's finding was that EPA's authorization of conditional approval fully and conclusively resolved the question of whether states could postpone submission of the plans beyond the deadline. Here, by contrast, EPA's adoption of the settlement policy did not constitute a final disposition of anything; it merely announced principles that may or may not be used in specific circumstances at some time in the future. The court's determination in *Natural Resources Defense Council* thus is not controlling in the instant case.

Another case cited by plaintiffs, *Ciba–Geigy Corporation v. EPA,* 801 F.2d 430 (D.C.Cir.1986), also is not directly on point. In that case the court held that EPA took final action when it instructed a company that it was not entitled to a hearing before EPA was permitted to require a labeling change for one of the company's pesticides. *Id.* at 436–37. This conclusion was supported by findings that EPA's decision was definitive—in that it "admit[ted] of no ambiguity" and "gave no indication that it was subject to further agency consideration or possible modification"—and had "direct and

immediate effect" by requiring the company's "immediate compliance" and by setting out the agency's legal position that would be entitled to considerable judicial deference. *Id.* (citations omitted). By contrast, EPA's action here did not bear solely on one company, it explicitly stated that it was subject to revision on a case-by-case basis, and it did not set out a legal position that would bolster a prospective litigation stance. As a result, the ruling in *Ciba–Geigy* does not support plaintiffs' position.

The same is true of *United States Telephone Association v. FCC,* 28 F.3d 1232 (D.C.Cir.1994), where the court, without discussing whether it was final agency action, held that a schedule of fines developed by the FCC was not a policy statement, but rather a rulemaking subject to notice and comment requirements. *Id.* at 1235. That case, however, had three features missing here. First, the court determined that the FCC had adhered slavishly to the schedule of fines in more than 300 individual cases—exercising discretion to depart from the schedule in only one. *Id.* Second, the court found evidence indicating that the agency viewed the putative policy statement as "a rule in masquerade." *Id.* Finally, the schedule of fines accounted for a wide range of contingencies and disparate circumstances, providing for specific adjustments "to the base amount [of fine] depending on various aggravating or mitigating factors." *Id.* at 1233. In the instant case, plaintiffs have alleged[3] that the principles announced in the settlement policy have been applied in only one case—hardly a record like the one before the court in *United States Telephone Association.* Furthermore, defendants have already stipulated that the settlement policy is not a rule. *See* Mot. to Dismiss Ex. A at 2. Finally, the settlement policy offers ample latitude to the agency not to apply the policy's principles in particular cases, and does not delineate the precise consequences of the agency's exercise of such discretion. Accordingly, plaintiffs' invocation of circuit caselaw fails to avert the conclusion that the settlement policy does not mark the consummation of EPA's decision-

---

3. Plaintiffs conceded at the November 6 hearing that there is no evidence of this settlement in the record.

making process, and therefore is not final agency action.[4]

### 2.

██ Defendants argue with respect to the second prong of the finality standard that the settlement policy does not determine rights or obligations and produces no legal consequences because, as "neither a rule nor an order," it "has no independent or binding legal effect." Mot. to Dismiss at 14. The plain language of the policy, and relevant caselaw, again establish that defendants' position is correct. Looking first to the language employed by the agency, *Syncor International Corporation v. Shalala*, 127 F.3d 90, 94 (D.C.Cir.1997), the policy asserts that it is intended to guide future settlements, not bind them. *See, e.g.*, 63 Fed.Reg. at 8201 (policy is "intended exclusively as guidance for employees of the U.S. Government"). For example, the policy explicitly provides that "[t]he United States will not apply this policy where, under the circumstances of the case, the resulting settlement would not be fair, reasonable, or in the public interest." *Id.* at 8200; *see also id.* at 8198 (stating that certain contributors of municipal solid waste "may not be eligible for a settlement pursuant to this policy if EPA determines ... that application of this policy would be inequitable"). To facilitate this determination, the policy instructs regional offices to "carefully consider and address any public comments on a proposed settlement that questions [sic] the settlement's fairness, reasonableness, or consistency with the statute." *Id.* at 8200. The policy also vests EPA with discretion to deviate from the policy's baseline figures, and permits the agency to do so based on consideration of numerous, specifically delineated factors, in addition to "equitable" ones. *Id.; see also id.* at 8201 ("Whether and how

the United States applies the guidance to any particular site will depend on the facts at the site."). These statements, which demonstrate that the settlement policy does not fashion binding rules but rather enunciates principles that can be tailored to particular fact-bound situations, are considered strong evidence of an agency's intent not to undertake final action. *See, e.g., Syncor Int'l Corp.*, 127 F.3d at 94; *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538 (D.C.Cir.1986); *Pacific Gas & Electric*, 506 F.2d at 39, 40.

The policy's plain language also establishes that it does "not command anyone to do anything or to refrain from doing anything," does "not subject anyone to any civil or criminal liability," and does not "create ... legal rights or obligations." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, ——, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998). For instance, the policy does not require any party to undertake a cleanup of a Superfund site, does not exempt any party from such obligation, and does not fix the rate that a particular party must pay to satisfy its cleanup responsibility. It also is not a formal rule that entitles a party to obtain a settlement using the figures set out in the policy. This predicate closely parallels that in *Pacific Gas & Electric*, 506 F.2d 33, where the court held that the Commission's order was not final agency action because it did "not establish a curtailment plan for any particular pipeline." *Id.* at 40. Instead, the order, like the settlement policy here, merely developed principles that carried no force in the abstract, and could determine rights or obligations only in prospective situations.

These features distinguish the instant case, and *Pacific Gas & Electric*, from *Bennett v.*

---

4. At the November 6 hearing, plaintiffs also referenced *Kelley v. EPA*, 15 F.3d 1100 (D.C.Cir. 1994), where our court of appeals invalidated a regulation on the ground that EPA lacked authority to define and limit CERCLA liability of an entire class of parties. Like the cases discussed in the text, however, this too fails to support plaintiffs' case. First, counsel cited *Kelley* for the proposition that EPA lacks authority to define the liability of municipal owners, operators, generators, and transporters, an issue entirely separate from the question of whether the settlement policy constitutes final agency action. Second,

the regulation in *Kelley* was of an entirely different ilk than the one here; not only was it a formal rule that by definition was final action, but it announced standards for determining when secured creditors were liable for cleanup costs—including in private litigation. *Id.* at 1104. Unlike in this case, where EPA's authority to enter into settlements with potentially liable parties is not challenged, *see* 42 U.S.C. § 9622, the court in *Kelley* held that Congress intended for "[l]iability issues ... to be decided by the court ...." *Kelley*, 15 F.3d at 1107.

*Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In *Bennett* the Court highlighted the government's concession that the Fish & Wildlife Service's Biological Opinion had "a powerful coercive effect on the action agency"—the Bureau of Reclamation—as action by Bureau personnel that ignored the Opinion and harmed endangered species could result in substantial civil and criminal penalties. *Id.* 117 S.Ct. at 1164–65. It thus was clear to the Court that issuance of the Biological Opinion determined rights and obligations of the Bureau, and had palpable legal consequences flow from it: "A Biological Opinion of the sort rendered here alters the legal regime to which the action agency is subject." *Id.* at 1164; *see also id.* at 1169 ("[T]he Biological Opinion at issue here has direct and appreciable legal consequences."). Such is not the case here, as the settlement policy does not state a position that either binds the agency or that bears on the rights or obligations of private parties. *See Action on Smoking and Health v. Department of Labor,* 28 F.3d 162, 165 (D.C.Cir.1994).

Plaintiffs counter that mere existence of the settlement policy has spawned, and will continue to spawn, serious consequences that are indicative of final agency action. They contend that the figures set out in the policy are sufficiently attractive that municipal owners, operators, generators, and transporters will be inclined to enter into settlements with EPA to secure protection from contribution claims asserted by other potentially liable parties—namely, plaintiffs' members. Opp. at 2, 29. Thus, plaintiffs argue that the settlement policy diminishes their power to bargain with owners, operators, generators, and transporters to broker settlements before having to assert their contribution claims. *Id.* at 2, 7, 16, 25, 29.

Plaintiffs' argument is insufficient to prove that the settlement policy meets the second prong of the *Bennett* finality standard. Diminished bargaining power may be an injury, but plaintiffs have not demonstrated that their members have a protected right to *bargain* with other potentially liable parties; they therefore have not proven that the settlement policy determines rights within the meaning of *Bennett.* The Supreme Court's holding in *Clinton v. City of New York,* —— U.S. ——, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), does not suggest otherwise. While the Court held that an allegation of diminished bargaining power was sufficient to confer standing, *id.* 118 S.Ct. at 2100, Congress had granted the complaining party a "statutory 'bargaining chip,'" *id.;* the President's decision to cancel the limited tax benefit therefore nullified plaintiff's ability to exercise that *right.* Plaintiffs here have not pointed to an analogous statutory grant.[5] CERCLA authorizes any party to initiate a legal action seeking "contribution from any other person who is liable or potentially liable" under the Act, 42 U.S.C. § 9613(f)(1), but it does not vest a right to *bargain* with such parties. Furthermore, Congress already has limited substantially the right to seek contributions by specifically legislating that parties' exposure to contribution actions is terminated when they resolve their liability with EPA. *Id.* § 9613(f)(2); *see also id.* §§ 9622(g)(5), (h)(4). Plaintiffs' allegations of diminished bargaining power therefore do not satisfy the second *Bennett* prong.

Finally, the settlement policy does not impose obligations on plaintiffs' members simply because it identifies "presumptive baseline" rates that operators, owners, generators, and transporters will be charged in prospective settlements. 63 Fed.Reg. at 8199. Because EPA retains ample discretion to deviate from such rates, and because there is no record of EPA applying the rates in particular cases, plaintiffs have not established that mere existence of the settlement policy encumbers them with the burden of persuading EPA not to apply the "presumptive baseline." In fact, with no evidence of EPA's record applying the policy's principles to specific settings, it is far from clear that the settlement policy in any way alters the current regime that enables outside parties to comment on proposed settlements and seek judicial review of them.

---

5. They also have not argued persuasively that an alleged harm sufficient to confer standing necessarily is sufficient to prove that rights and obligations have been determined, or that legal consequences have been produced.

*See, e.g.,* 42 U.S.C. § 9622(i). Accordingly, plaintiffs have not shown that the settlement policy determines rights and obligations, or produces legal consequences. As a result, as a matter of law the settlement policy is not final agency action, and therefore is not reviewable in this Court. Defendants' motion to dismiss for lack of subject matter jurisdiction must be granted.

## III.

■ Defendants also make a persuasive argument that this case is not justiciable because the settlement policy is not ripe for review. *See Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *see also Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, ——— ———, 118 S.Ct. 1665, 1670–72, 140 L.Ed.2d 921 (1998). First, the issues presented are not fit for judicial decision at this time: Intervention may impede EPA's ability to apply the settlement policy's principles to a particular setting, and judicial review necessarily would "benefit from letting the question arise in some more concrete ... form." *Cronin v. Federal Aviation Admin.,* 73 F.3d 1126, 1131 (D.C.Cir.1996) (citation and internal quotation marks omitted); *see also Ohio Forestry Ass'n,* 118 S.Ct. at 1672 ("This type of review threatens the kind of 'abstract disagreements over administrative polices' that the ripeness doctrine seeks to avoid.") (internal citation omitted).

Second, withholding consideration of the policy until a specific settlement is presented for review will not cause "significant" hardship. *Id.* at 1670. Plaintiffs will be able to object to a settlement when it is proposed, *see* 42 U.S.C. § 9622(i), and in the meantime their *rights and obligations* will not be affected by mere existence of the settlement policy, *Ohio Forestry Ass'n,* 118 S.Ct. at 1672, and they "need not change their behavior or risk costly sanctions." *Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1205 (D.C.Cir.1998). Finally, plaintiffs have not made a sufficient demonstration that the issues are purely legal, and have failed to prove that the settlement policy is final action. *See supra* IIA; *Cronin,* 73 F.3d at 1131. Accordingly, plaintiffs have not overcome defendants' argument that this case is not ripe for review.

## IV.

■ Plaintiffs also have failed to state a claim upon which relief can be granted with respect to their contention that EPA did not employ "reasoned decisionmaking" when it adopted the settlement policy. Opp. at 31. As an initial matter, plaintiffs are incorrect that by advancing this basis for their motion to dismiss defendants "flout[ed]" this Court's Order of July 2, 1998. *Id.* at 5. That Order allowed defendants to file a motion to dismiss before responding to plaintiffs' motion for partial summary judgment. Order of 7/2/98. Notwithstanding a reference to defendants' representation that the motion would challenge jurisdiction, the Order did not limit defendants to jurisdictional arguments, but spoke generally of "a motion to dismiss." *Id.* Defendants therefore have not violated the terms of the July 2 Order.

As to the merits of defendants' argument, plaintiffs have failed to state a claim upon which relief can be granted, as the Administrative Procedure Act expressly excludes general policy statements from procedural requirements applicable to rulemaking. 5 U.S.C. § 553(b)(3)(A). Plaintiffs, however, argued at the November 6 hearing that their APA claim was that defendants were required to engage in "reasoned decisionmaking," not that they were obligated to comply with notice and comment requirements. Yet other than two cases involving prerequisites for promulgating a formal rule, plaintiffs have offered no statutory or jurisprudential support for their claim. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 42–44, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Milk Indus. Found. v. Glickman,* 949 F.Supp. 882, 893 (D.D.C. 1996). Accordingly, since plaintiffs have conceded that the settlement policy is not a rule, *see* Mot. to Dismiss Ex. A at 2, their APA argument fails to state a claim upon which relief can be granted.

For the foregoing reasons, defendants' motion to dismiss is granted. An accompanying Order implements the decision announced herein.

*ORDER*

For the reasons stated in an accompanying Memorandum, it is this 16th day of November, 1998, hereby

ORDERED: that defendants' motion to dismiss is GRANTED; and it is further

ORDERED: that plaintiffs' motion for partial summary judgment is DISMISSED AS MOOT.