# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 18, 2013      Decided March 14, 2014

No. 12-1036

HUGH B. KAUFMAN,
PETITIONER

v.

THOMAS E. PEREZ, SECRETARY OF THE UNITED STATES
DEPARTMENT OF LABOR,
RESPONDENT

———

On Petition for Review of the Final Decision and Order of
the United States Department of Labor's Administrative
Review Board

———

*Regina M. Markey* argued the cause and filed the briefs for petitioner.

*Dean A. Romhilt*, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief was *Megan E. Guenther*, Attorney. *Heather R. Phillips*, Attorney, U.S. Department of Labor, entered an appearance.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

Opinion concurring in the judgment filed by *Circuit Judge* SRINIVASAN.

SENTELLE, *Senior Circuit Judge*: Hugh Kaufman, an employee of the Environmental Protection Agency ("EPA"), brought several claims against his employer for allegedly retaliating against him in violation of several environmental whistleblowing provisions. An administrative law judge ("ALJ") denied his claims, and the Administrative Review Board ("ARB") affirmed the ALJ's decision. Kaufman now petitions this court for review of the dismissal of seven claims. Because we conclude that the Board committed no error in its conclusion that the claims were barred by the relevant statutes of limitation, we deny Kaufman's petition for review.

## I.  BACKGROUND

### A.  Factual History

Kaufman is a program analyst at the headquarters of the EPA in Washington, DC. He has been employed by the EPA since its creation in 1971. At all times relevant to this proceeding, he was employed in the Office of Solid Waste and Emergency Response ("OSWER"). In 1999, Kaufman was assigned to the OSWER Assistant Administrator's Office, his position description was changed from Environmental Protection Specialist to Program Analyst, and his job description was expanded to include responsibilities assisting the OSWER Ombudsman, Robert Martin. The Ombudsman investigated public complaints, mediated disputes, and convened hearings regarding OSWER's

administration of the hazardous substance and solid waste programs. Though Martin assigned Kaufman work, Michael Shapiro was Kaufman's immediate supervisor and Timothy Fields served as his second-level supervisor. Fields, a Presidential appointee, was the Acting Assistant Administrator of OSWER at the time and Shapiro was the Acting Deputy Assistant Administrator.

Kaufman's conduct at OSWER hearings became a matter of controversy early in his tenure with the Ombudsman. His pattern of behavior culminated in an extraordinary incident at a Town Hall meeting concerning a Superfund site in Tarpon Springs, Florida, in June of 2000. The June meeting followed two earlier Tarpon Springs sessions in which Kaufman had, according to EPA officials, ridiculed personnel and failed to conduct impartial and professional hearings. Kaufman chaired the June 5, 2000 meeting. Two EPA representatives appeared: Joanne Benante, Chief of the North Florida Section of EPA's Region IV, and Michelle Staes, Assistant Regional Counsel and the Region IV attorney assigned to the site. Kaufman conducted the hearing, not as an impartial ombudsman proceeding, but in a confrontational fashion belittling and demeaning the EPA representatives, especially attorney Staes. He set the tone of his behavior from the outset, reading Benante and Staes Miranda warnings as if they were in-custody criminals. He went on to allege that the EPA in the Region was stonewalling Congress and the Justice Department. He further demeaned attorney Staes, lamenting that "all these big shot men and big shot women [in the EPA] who have been in it for 20, 30 years have to hide behind the skirts of a little black girl just out of law school."

As the ALJ noted, "[r]esponse to Kaufman's performance was swift." Stephen Luftig, Director of the Office of Emergency and Remedial Response, wrote a letter to the

Ombudsman dated June 12, 2000 to express concern over reports of the "abusive, bullying tactics and the lack of impartiality" shown by Kaufman at the hearing one week earlier. The letter also characterized the Miranda-rights incident as part of a pattern of inappropriate behavior, and requested an explanation. In response to Luftig's letter, Kaufman accelerated the confrontation. His written response, among other things, demanded that Luftig either present substantiating evidence or apologize, and suggested that Luftig's memorandum to him "was a knowingly reckless, false, misleading, and inaccurate document intended to thwart and obstruct an ongoing federal investigation, and a knowing attempt to harm the federal officials performing the investigation." Shapiro issued an Official Reprimand dated September 29, 2000, chastising Kaufman for his conduct at the June 5, 2000 meeting.

Fields testified before the ALJ that these and other incidents led him to conclude that Kaufman's support of the Ombudsman was not working. On December 14, 2000, Fields met with Kaufman and informed him that he would no longer be performing Ombudsman duties. Fields embodied this message in a memo that set forth Kaufman's behavior at the Tarpon Springs hearing and other hearings, characterizing that behavior as "inappropriate, unprofessional, and lacking in impartiality." The memo advised Kaufman that "examples of your lack of impartiality and professionalism are numerous." In addition to the Miranda warnings and the demeaning treatment of Staes set forth above, the memo recited other examples of similar behavior by Kaufman, including other occurrences at Tarpon Springs and hearings in Ohio and Idaho.

The memo stated that at the Idaho hearings Kaufman "asked at least three different hearing participants the same

inappropriate question: 'Do you believe there was and/or is evidence of a cover-up related to the [industrial excess landfill] activities?'" Fields described this type questioning as "aimed at inciting public angst, rather than objective fact-finding" and as reflecting "[Kaufman's] lack of impartiality in the performance of [his] Ombudsman-related duties."

The memo referred to Kaufman's having "used language and made statements which were inappropriate for an objective federal official in Idaho." By way of example, he stated that the public had been "used as pawns" and that "the Department of Justice has asked EPA to, basically, kill the Ombudsman program." The memo related Kaufman's having stated at the same hearing that he thought the EPA was "raping" the people of the Idaho Valley.

After reciting the examples of Kaufman's lack of impartiality and professionalism, the Fields memorandum informed Kaufman that he would no longer be performing Ombudsman's duties and that the reference to such duties would be removed from his position description. Without doubt, Kaufman understood the import of Fields's memorandum. In a January 8, 2001 *Environment News Service* article, Kaufman claimed that he had been "ousted from the Ombudsman's Office because he exposed EPA wrongdoing at a number of agency-managed hazardous waste clean-up sites." He further characterized his "ouster" as being "'political revenge' for his office's damning revelations about failed Democratic presidential candidate Al Gore."

On January 20, 2001, a new administration took office. On January 29, 2001, Martin issued a memo stating he was unable to perform substantial Ombudsman tasks, due in part to Kaufman's reassignment. On January 30, 2001, Christine Todd Whitman was confirmed as the new EPA Administrator.

The next day, Shapiro met with Kaufman to discuss Kaufman's job performance. Kaufman asked Shapiro if he was withdrawing Fields's memo—as a Presidential appointee, Fields had exited with the previous administration. Shapiro confirmed that he was not.

In early February, Martin requested Kaufman's help with Ombudsman tasks. Shapiro rejected his request. On February 13 and 21, Shapiro addressed the matter again with Martin, reaffirming that Kaufman would not be assigned Ombudsman work. Nonetheless, on February 15, Kaufman submitted a travel request to attend an Ombudsman hearing, which Shapiro denied. On February 22, Shapiro issued a memo to Martin summarizing his previous conversations and again affirmed that Kaufman would not be available to support the Ombudsman. Finally, on February 23, after Shapiro again received reports of Kaufman's participation in Ombudsman functions, he orally informed Kaufman again that Kaufman was prohibited from performing Ombudsman duties. Kaufman asked Shapiro to put that prohibition in writing.

Before Shapiro could do so, Kaufman sent him a memo dated March 6, asserting, among other things, the "fact" that his prohibition expired when Fields left the EPA. Accordingly, he asked Shapiro to provide "unequivocal clarification . . . as to whether [Shapiro was] going to take an adverse action against" Kaufman. Around the same time, Kaufman discovered what he perceived as a conflict of interest on Administrator Whitman's part at one of the cleanup sites. He reported this possible conflict to the Inspector General, and spoke to the press about it as well, accusing Whitman of stopping the Ombudsman from giving him assignments to reduce the chances that the site would be forced to comply with environmental laws. The Inspector

General investigated Kaufman's allegations and found them to be unsubstantiated.

On March 14, 2001, Shapiro responded to Kaufman's March 6 memo with one of his own in which he reiterated Kaufman's prohibition, expressed shock at the assertion that Fields's memo expired with the change of administration, and attached a copy of the memo. Shapiro also attached a copy of Kaufman's position description with Ombudsman-related duties removed. Kaufman responded by alleging that Shapiro was making false statements, and intimating that Shapiro's memo was motivated by Kaufman's recent whistleblowing activity regarding Administrator Whitman. Kaufman also threatened "to make a criminal referral of this matter to the Department of Justice," if Shapiro did not let him perform Ombudsman duties. Shapiro responded on March 16, 2001, again reiterating the prohibition, and again noting Kaufman's mischaracterization of the effects of the Fields memo.

On the same date, Shapiro sent a memorandum to Martin advising him that Kaufman had apparently transmitted a round of "interrogatories" and requests for production of documents in connection with a Superfund site inquiry in Colorado, requesting that responses be sent to Martin. In the memorandum to Martin, Shapiro reiterated that Kaufman had been officially and verbally terminated from all Ombudsman functions. The memorandum further advised explicitly: "As we have discussed previously, unless otherwise directed by me, you should not involve Mr. Kaufman in any national Ombudsman-related activities as part of his EPA responsibilities."

Around the same time, another EPA employee, Barry Stolls, was detailed to assist the Ombudsman, and the EPA exempted several new full-time Ombudsman staff positions

from a hiring freeze then in effect. On April 6, Shapiro encouraged Martin to actively recruit for those new vacant staff positions. Martin continued to request that Kaufman be reassigned Ombudsman duties, and Shapiro denied his requests on April 16 and May 22.

On November 27, 2001, Administrator Whitman announced her decision to move the Ombudsman function to the Office of the Inspector General ("OIG") in response to concerns voiced by Congress and the General Accounting Office. The Ombudsman was ultimately moved to OIG on April 13, 2002.

### B. Procedural History

Kaufman first complained to the Department of Labor on April 3, 2001, alleging violations of the employee protection provisions in various environmental statutes. The Occupational Safety and Health Administration determined that the EPA had unlawfully retaliated against Kaufman for doing his job "too effective[ly]." The EPA appealed the ruling, and after years of discovery disputes an ALJ conducted a 14-day hearing on Kaufman's claims.

Kaufman's amended complaint before the ALJ requested relief under the whistleblower provisions of seven environmental protection statutes: the Clean Air Act, 42 U.S.C. § 7622; the Safe Drinking Water Act, 42 U.S.C. § 300j-9; the Solid Waste Disposal Act, 42 U.S.C. § 6971; the Federal Water Pollution Control Act, 33 U.S.C. § 1367; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9610; the Toxic Substances Control Act, 15 U.S.C. § 2622; and the Energy Reorganization Act, 42 U.S.C. § 5851.

Kaufman's complaint set out nine claims relating to the following events:

- Claim 1: The December 14, 2000 removal of Kaufman's Ombudsman duties;

- Claim 2: The March 5, 2001 decision to assign Stolls to the Ombudsman;

- Claim 3: The refusal to assign Ombudsman duties to Kaufman after the removal of the hiring freeze in March 2001;

- Claim 4: The issuance of the March 16, 2001 memo stating Kaufman was prohibited from performing Ombudsman work;

- Claim 5: The issuance of the April 6, 2001 memo to Martin inquiring about recruitment actions;

- Claim 6: The issuance of the April 16, 2001 and May 22 memos to Martin denying his request to assign Kaufman Ombudsman duties;

- Claim 7: The November 27, 2001 announcement to transfer the EPA Ombudsman to the OIG;

- Claim 8: The April 12, 2002 transfer of the Ombudsman to the OIG;

- Claim 9: The creation of a hostile work environment for Kaufman from June 2000 to April 2002.

The ALJ dismissed all of Kaufman's claims. First, the ALJ dismissed Kaufman's claims under the Toxic Substances Control Act and the Energy Reorganization Act for lack of jurisdiction. Second, the ALJ found Claim 1 untimely; the statutes of limitations in the whistleblower provisions of the remaining environmental protection statutes require a petitioner to file a complaint within thirty days after a "violation occurs." Kaufman complained on April 3, 2001. Thus any allegedly unlawful activity must have occurred on or after March 5 to be timely. Third, the ALJ dismissed Kaufman's hostile work environment claim (Claim 9).

Finally, as to Claims 2–8, the ALJ rejected Kaufman's argument that they represented discrete retaliatory acts, finding that they were "not adverse acts [to Kaufman] but rather the consequences of Fields'[s] December memo . . . ." After December 14, 2000, Kaufman "was in no position to be considered for assignment of Ombudsman functions," and the ALJ found nothing in the record to support Kaufman's claim that a change in administration would nullify the memo. Specifically, the ALJ concluded that

> Kaufman could not have any uncertainty about the Fields memo. The memo is unambiguous, and Fields met with him personally to deliver the memo and to explain that he was no longer to do Ombudsman-related work. Both Fields and Kaufman testified that Kaufman understood the decision, and both testified that Kaufman responded that he would stop doing Ombudsman work.

Ultimately, the ALJ found that "Kaufman's argument that he was . . . uncertain about whether he could perform Ombudsman related duties strain[ed] credibility." Because Kaufman was permanently prohibited from assisting the

Ombudsman, the EPA's actions in staffing the Ombudsman office—and its repeated affirmations of Kaufman's prohibition from Ombudsman-related duties—had no effect on him. Moreover, the ALJ reasoned, allowing these actions to restart the filing clock would make "mincemeat out of the requirement to timely file," because "[a]ll employer adverse actions would be subject to reopening merely by continuing to request reinstatement, and then counting the time to file from each denial."

As to the decisions to transfer the Ombudsman to the OIG (Claims 7–8), the ALJ found them non-adverse to Kaufman as well. Kaufman had not shown that any of his Ombudsman duties would have been reinstated after a transfer in light of the December 14 memo: "[t]hus, the transfer of the Ombudsman had no effect on the future employment of Kaufman."

On November 30, 2011, the ARB affirmed the ALJ's decision. It found that substantial evidence supported the ALJ's determination that the EPA expressly removed Kaufman's Ombudsman-related duties pursuant to Fields's memo. It also affirmed the ALJ's legal determination that Fields's memo—as the final, definitive, and unequivocal notice of the EPA's adverse action—marked the moment the limitations period began to run, and not the later consequences embodied in Claims 2–8. Thus, Kaufman's claims were untimely.

In his appeal to this Court, Kaufman challenges the portion of the ARB's decision finding Claims 2–8 untimely.

## II.      ANALYSIS

### A.  Jurisdiction

Four of the environmental statutes upon which Kaufman relies provide for judicial review in the circuit court in which either the complainant resides or transacts business or the environmental violation occurred. *See* 42 U.S.C. § 7622(c)(1); 33 U.S.C. § 1367(b); 42 U.S.C. § 300j-9(i)(3)(A); 42 U.S.C. § 6971(b), 6976(b). The fifth, CERCLA, designates district courts as the forum for reviewing Board decisions. *See* 42 U.S.C. §§ 9610(b), 9613(b). However, courts of appeal may, for "judicial economy and consistency," assume jurisdiction over a CERCLA retaliation claim as long as there is also jurisdiction under other environmental statutes. 29 C.F.R. 24.112(d), 24.100(a). Kaufman is employed by the EPA in the District of Columbia, and his CERCLA retaliation claim stems from the same factual and legal background as his claims under the other statutes. Accordingly, we have jurisdiction over Kaufman's appeal.

### B.  Standard of Review

The Secretary rendered the decision under review pursuant to the employee protection provisions of the environmental statutes. We review such decisions in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 42 U.S.C. § 7622(c)(1); 42 U.S.C. § 300j-9(i)(3)(A); 42 U.S.C. § 6976(b); *see also Carus Chem. Co. v. U.S. Envtl Prot. Agency*, 395 F.3d 434, 441 (D.C. Cir. 2005) (applying the APA to CERCLA claim in the absence of a specified standard of review). We overturn the Agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). We set aside the ARB's factual findings "only if unsupported by substantial evidence on the record as a whole." *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007). It is an open question in this Circuit whether we afford *Chevron* deference to agency interpretations of statutes of limitations. *See AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 754 (D.C. Cir. 2012). We need not resolve that question here. Substantial evidence supports the ARB's factual findings, and given its factual findings, its legal conclusions follow under any standard.

## C. Disposition

To make out a *prima facie* case of retaliation under the whistleblower statutes, Kaufman was required to prove: (1) that he engaged in protected activity; (2) that *he suffered an adverse action*; and (3) that the protected activity was a motivating factor in the adverse action. *See, e.g.*, *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); 29 C.F.R. § 24.109. Critically, given that the ALJ and the Board dismissed the claims as being outside the statute of limitations, Kaufman was required to show that at least one of Claims 2–8 evidenced all the elements of a *prima facie* case on or after March 5, 2001. As the ALJ concluded, and we agree, none of the acts raised in Claims 2–8 alleged any adverse action suffered by Kaufman after that critical date.

The original adverse action argued by Kaufman is the removal of his Ombudsman-related duties in Fields's letter of December 14, 2000. We note at the outset that it is not crystal clear that the change of duties constitutes an adverse employment action within the meaning of whistleblower and other employment discrimination statutes. *Cf. Brown v. Brody*, 199 F.3d 446, 455 (D.C. Cir. 1999) (even when there is a "significant change in duties or responsibilities . . . there

must still be some kind of injury for a federal employee to state a claim"). Nonetheless, assuming for purposes of this decision that Kaufman's allegation of the original charge raises such an adverse action, the ALJ, and the Board in affirming the ALJ, correctly determined that Kaufman suffered no adverse action by any of the subsequent responses from the EPA to his pleas for restoration of the duties.

Kaufman couches his challenges to the ARB's decision as two issues: first, that the Board did not analyze whether Claims 2–8 were motivated by independent retaliatory intent, and second, that the ARB applied the wrong standard for determining whether there was an adverse action. Logically, however, one determination governs both. If there was no adverse action evidenced in Claims 2–8, then the ALJ correctly dismissed those claims and the Board correctly affirmed. Substantial evidence supports the decision to dismiss those claims.

The ARB concluded that Claims 2–8 set forth no adverse action on the finding that the EPA unequivocally barred Kaufman from performing Ombudsman duties on December 14, 2000, and that neither Kaufman nor Martin was confused about the effect of that action. Substantial evidence supports this conclusion. On December 14, 2000, Fields met with Kaufman, and told Kaufman he would no longer be performing Ombudsman duties. He issued Kaufman a memo which could not have been clearer about its effect: "you will no longer perform any Ombdusman-related duties, effective immediately." Shortly after this meeting, Kaufman spoke to the press about his removal, describing his "ouster" as "'political revenge' for his office's damning revelations about failed Democratic presidential candidate Al Gore."

If that were not enough, Shapiro reiterated time and again the finality of the EPA's actions to both Kaufman and Martin. On January 31, 2001—*after* the change of administration—Kaufman asked Shapiro if he would be withdrawing Fields's memo. Shapiro confirmed he would not. In early February, Martin requested Kaufman's help to assist him with Ombudsman duties. Shapiro rejected his request and readdressed the matter twice more on February 13 and February 21, reaffirming that Kaufman would not be assigned Ombudsman work. Finally, on February 23, 2001, Shapiro again reminded Kaufman that he was prohibited from performing Ombudsman duties.

This review demonstrates the more than substantial evidence the ALJ had at hand to conclude that after the December 14 memo Kaufman "was in no position to be considered for assignment of Ombudsman functions." Fields's memo was clear and Shapiro never wavered in his commitment to its effect.

Because Kaufman was barred from performing Ombudsman duties as of December 14, he could not have suffered adverse action through the EPA's direct and indirect failure to subsequently assign him such work. The EPA's decision to assign Stolls to the Ombudsman, its inquiries about recruiting efforts, its continuing refusal to assign Ombudsman work to Kaufman, and its memos to this effect (Claims 2–6) were not adverse to Kaufman. Thus the motivation behind these actions is immaterial.

Moreover, the ARB correctly identified these subsequent actions as "delayed, but inevitable, consequence[s]" of the decision embodied in the Fields memo, and thus not themselves actionable. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 257–58 (1980). The ALJ likened Kaufman's case to

*Ricks* in which the Supreme Court held that the allegedly discriminatory denial of tenure triggered the limitations period, not the eventual end of a professor's employment as a result. *Id.* In *Ricks*, "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks." *Id.* at 258. This was so "even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later." *Id.* (emphasis in original).

As the ALJ noted, the "proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Id.* at 258 (emphasis in original, quotations omitted). Because the EPA actions underlying Claims 2–6 were no more than consequences of the December 14 memo, they were not themselves actionable. *See also Jarmon v. Powell*, 208 F. Supp. 2d 21, 30 (D.D.C. 2002) (employee's claim that he was denied a promotion to a GS-15 position—for which he was ineligible due to an earlier allegedly discriminatory promotion denial—was "not an actionable violation in its own right" because the employee's "subsequent ineligibility for the GS-15 promotion . . . [was] just 'a delayed, but inevitable consequence' of the non-promotion to GS-14") (quoting *Ricks*, 449 U.S. at 257–58).

Kaufman's Claims 7–8 fare no better. These two claims do not concern any employment action taken toward Kaufman at all. Kaufman bases these claims on the policy decision of the agency to transfer the EPA Ombudsman to the Office of the Inspector General, which Kaufman breaks into two parts: Claim 7, referring to the announcement to transfer the Ombudsman, and Claim 8, the eventual transfer. Again, assuming that such a reorganization could ever constitute an

employment action for purposes of a whistleblower claim, Kaufman has not established such a case here. Kaufman has not shown that any of his Ombudsman duties would have been reinstated after a transfer in light of the December 14 memo. Even Kaufman concedes that he was prohibited from performing Ombudsman duties as of Shapiro's March 16, 2001 memorandum to him. Thus there is no way the reorganization could have been adverse action toward him.

Perhaps a failure to reinstate might in some circumstances constitute an independent discriminatory act, but Kaufman's case does not present such a scenario. True, courts have found failures to reinstate actionable in the face of uncertainty regarding the initial adverse action. *Cf. Rich v. Associated Brands, Inc.*, 379 F. App'x 78, 82 (2d Cir. 2010) (suggesting failure to rehire can be independently actionable if employee does not receive "definite notice" that original termination foreclosed employment for foreseeable future). Similarly, courts have found failures to reinstate actionable given an intermediate change in the substantive policy that produced the initial firing. *See, e.g.*, *Inda v. United Air Lines, Inc.*, 565 F.2d 554, 557–58 (9th Cir. 1977). Finally, courts have found failures to reinstate actionable where a complainant can show disparate treatment or bias in the reinstatement process. *See E.E.O.C. v. City of Norfolk Police Dep't*, 45 F.3d 80, 84 (4th Cir. 1995) ("[Plaintiff] asserts that . . . while similarly suspended white officers were immediately reinstated after criminal charges against them were dismissed, because of his race, Black, he was denied immediate reinstatement after the criminal charges against him were dismissed.") (alterations and quotations omitted); *Samuels v. Raytheon Corp.*, 934 F.2d 388, 391 (1st Cir. 1991) ("Were Samuels able to establish the existence of unlawful bias in . . . hearing process or . . . decision, . . . refusal to reinstate . . . might provide a separate, actionable event under

title VII."); *E.E.O.C. v. Hall's Motor Transit Co.*, 789 F.2d 1011, 1015 (3d Cir. 1986) ("Sharpe contended not that he had been denied an appeal nor that his appeal was not processed through the usual procedure, but that it was resolved on less favorable terms than those of younger employees.").

All of those cases evince features absent in Kaufman's. Initial or subsequent uncertainty, or a defect in the reinstatement process, rendered the failure to reinstate independently *adverse* to the claimant. All of the employees in those cases could claim that, but for the later retaliatory action, they may have resumed the employment that was earlier terminated. Kaufman has failed to demonstrate any uncertainty about his prohibition. Since there was never in this case a termination, there was no reinstatement process, nor indeed any other process, let alone a defective process. Because his prohibition was clear from the beginning, and that clarity never abated, Kaufman has failed to demonstrate that any later actions were adverse. The ARB did not err in ending its analysis with this conclusion.

Kaufman's arguments that the acts complained of in Claims 2–8 commence the rerunning of the statute of limitations would effectively write the statutes of limitations out of the law. Congress cannot have intended in setting periods of limitation that claimants could begin the clock running anew simply by demanding the undoing of a time-barred employment action. Under Kaufman's interpretation, the statute would never run. A terminated employee, whether or not he had a valid claim in his termination, cannot come back later and revive a barred claim simply by asking, "Am I still fired?" Neither can Kaufman recommence his period of limitations by declaring that the employing administration should reinvest him with his divested duties.

19

## CONCLUSION

For the foregoing reasons, the petition for review is denied.

*So ordered.*

1

SRINIVASAN, *Circuit Judge*, *concurring in the judgment*: I concur in the court's decision to deny Kaufman's petition for review. I respectfully disagree, however, with the majority's reasons for rejecting Kaufman's claims. I write separately to clarify the circumstances in which, as I see it, an employer's refusal to reinstate an employee to his former position might be independently actionable.

To state a claim under federal antiretaliation laws, an employee must show that he suffered a materially adverse action by his employer that was causally linked to his statutorily protected activity. *Ante*, at 13; *accord Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532-33 (2013). If the employer articulates a "legitimate nonretaliatory reason" for the adverse action, the employee must establish that the employer's proffered reason for the action is "pretext." *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006). The requirements for a retaliation claim largely track the requirements for a discrimination claim, although in the discrimination context, the employee must show that the adverse action was connected to his membership in a statutorily protected class rather than to his statutorily protected activity. *See Gilbert v. Napolitano*, 670 F.3d 258, 261-62 (D.C. Cir. 2012).

The majority assumes that EPA's original decision to prohibit Kaufman from performing Ombudsman-related duties was "adverse" to Kaufman. *Ante*, at 14.[*] The majority then goes

---

[*] The majority suggests that it is "not crystal clear" that EPA's original decision to bar Kaufman from performing Ombudsman-related work would constitute an "adverse" action under federal antiretaliation laws. *Ante*, at 13. But the case that the majority cites

on to conclude that EPA's later actions denying reinstatement of Kaufman's Ombudsman duties failed to constitute adverse actions and that any claims arising from those subsequent actions were therefore untimely. Although I agree that Kaufman's claims concerning those subsequent actions are deficient and that the ARB's rejection of those claims should be affirmed, I part ways with the majority on the rationale by which to reach that conclusion.

This case began when Kaufman initially filed his whistleblower complaint on April 3, 2001. The limitations

for this claim, *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), appears to have been superseded on that point by a later Supreme Court decision. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (action is "adverse" under Title VII antiretaliation provision if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotation marks omitted); *see also Steele v. Schafer*, 535 F.3d 689, 695-96 (D.C. Cir. 2008) (district court erred by relying on *Brody* standard rather than *Burlington Northern* standard). The Secretary of Labor, the respondent in this case, acknowledges that "Kaufman suffered an actionable harm when the EPA barred him from performing Ombudsman duties." Resp't Br. 43. The Secretary's recognition is unsurprising, as EPA's decision to prohibit Kaufman from performing Ombudsman-related work falls squarely within the now-settled understanding of an "adverse action" in the retaliation context. *See generally Baird v. Gotbaum*, 662 F.3d 1246, 1248-50 (D.C. Cir. 2011). And while transfer to a materially less favorable set of responsibilities would itself suffice to constitute an adverse action, Kaufman also contends that EPA's decision to bar him from performing Ombudsman work had the effect of preventing his promotion from a GS-14 salary level to a GS-15 level. A forced transfer resulting in denial of a salary increase readily qualifies as "adverse" under any definition. *See Burlington Northern*, 548 U.S. at 68; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

period under federal antidiscrimination and antiretaliation laws starts to run when the challenged action is made and the employee is notified. *Del. State Coll. v. Ricks*, 449 U.S. 250, 259 (1980). Here, Kaufman had been informed on December 14, 2000, in the Fields memorandum, that he could no longer perform Ombudsman work. The 30-day limitations period for any claim based on the original decision to remove Kaufman's Ombudsman duties thus expired on January 13, 2001, well before Kaufman filed his complaint. Kaufman nevertheless initially asserted such a claim, but the ARB found it untimely, and Kaufman does not appeal that determination.

His appeal instead concerns seven claims (Claims 2-8) arising from *later* actions by EPA that, as Kaufman sees it, manifest EPA's subsequent refusal to reinstate him to his Ombudsman responsibilities. *Ante*, at 9. Two of the claims (Claims 7 and 8) pertain to EPA's decision to transfer Ombudsman functions to the Office of Inspector General. The ALJ found that "the transfer of the Ombudsman had no effect on the future employment of Kaufman," ALJ's Decision & Order at 43, and I see no reason to reject that factual determination. The remaining claims (Claims 2-6) concern actions taken by EPA in March, April, and May 2001, declining to reinstate Kaufman's Ombudsman duties and assigning those responsibilities elsewhere. Kaufman alleges that, in refusing to reinstate him to his former role, EPA retaliated against him for his protected whistleblower activities.

The majority allows that "[p]erhaps a failure to reinstate might in some circumstances constitute an independent discriminatory act." *Ante*, at 17. That is undoubtedly the case. *See Josephs v. Pac. Bell*, 443 F.3d 1050, 1060 (9th Cir. 2006) ("[W]e join the First, Third, Fourth, Tenth, and Eleventh Circuits and expressly recognize discriminatory failure to reinstate as a separately actionable claim." (collecting cases)).

4

Even if an employer's original decision to transfer or terminate an employee is entirely legitimate   or, as here, is immune from challenge because of the running of the limitations period   the employer's subsequent refusal to reinstate the employee to his former position or responsibilities, if itself motivated by discriminatory or retaliatory animus, is actionable in its own right.  The employer's invulnerability for its original adverse action affords no free pass to engage in discrimination or retaliation when asked to reverse that action.  The majority thus correctly includes, in its nonexhaustive list of situations in which a failure to reinstate might be independently actionable, circumstances "where a complainant can show disparate treatment or bias in the reinstatement" decision.  *Ante*, at 17.

Kaufman's allegations fit in that category because they allege retaliatory bias in the EPA's denial of reinstatement. Those claims fail, but, respectfully, not for the reasons cited by the majority.  In the course of explaining its rejection of Kaufman's claims, the majority observes that, "[s]ince there was never in this case a termination, there was no reinstatement process, nor indeed any other process, let alone a defective process." *Id.* at 18.  But the majority ultimately does not   and could not   rest on the absence of a "termination."  While Kaufman was never fired from his position, he was divested of his Ombudsman-related duties.  And the Supreme Court draws no distinction for discrimination or retaliation purposes between "termination" and other adverse actions such as "failure to promote" or "denial of transfer." *See Morgan*, 536 U.S. at 114. Nor does   or could   the majority ultimately hinge its decision on the absence of any formal "reinstatement process."  The denial of reinstatement can give rise to a claim if grounded in discriminatory or retaliatory bias, regardless of whether any formal process attends the denial.  Indeed, one of the cases cited by the majority in setting out when reinstatement claims might be made, *EEOC v. City of Norfolk Police Department*, 45 F.3d

80 (4th Cir. 1995) (cited *ante*, at 17), establishes that refusal of reinstatement through informal means can be actionable. *See Norfolk Police*, 45 F.3d at 84-85 (holding that where white police officers were customarily reinstated immediately after criminal charges against them were dropped, while an African-American officer was required to complete a formal administrative appeal process, EEOC can pursue a discrimination claim against the police department for failing to reinstate the African-American officer through informal procedures).

The majority ultimately rests its decision on the conclusion that EPA's actions denying reinstatement to Kaufman do not constitute adverse actions, and that the "motivation behind these actions" is thus "immaterial." *Ante*, at 15. I fail to see how that could be the case. Indeed, the majority correctly assumes that EPA's original removal of Kaufman's Ombudsman functions qualifies as an adverse action. *Id.* at 14. If so, the later refusal to reinstate precisely the same functions should equally count as an adverse action, no less than a refusal to rehire a previously terminated employee surely constitutes an adverse action. The question, then, is whether the adverse action was undertaken for an illicit reason. The motivation behind the EPA's denial of reinstatement here, consequently, is very much material. Considering the question of motivation to be "immaterial," in my respectful view, unduly complicates the resolution of reinstatement cases and deflects attention away from what should be the central issue: whether the denial of reinstatement was motivated by discriminatory or retaliatory bias.

I believe Kaufman's claims run aground on that issue. In certain cases, an employer's refusal to reinstate an employee to his former role may be motivated by the employer's adherence to its prior decision. And an employer's policy of declining to

revisit previous personnel decisions could constitute a legitimate, nonretaliatory, and non-pretextual reason for refusing to reinstate the employee. *See, e.g.*, *Collins v. Henderson*, 180 F.3d 988, 989-90 (8th Cir. 1999) (where plant manager said that, "'[i]n the interest of fairness and consistent treatment of all employees,'" the plant "'does not entertain reinstatements or transfers of personnel who have previously been released,'" the plant manager's explanation qualified as a "legitimate nondiscriminatory reason" for his decision). Moreover, an employer's refusal to reinstate an employee "cannot resurrect the old discriminatory act." *Burnam v. Amoco Container Co.*, 755 F.2d 893, 894 (11th Cir. 1985). For the failure to reinstate to be actionable in its own right, there must be "a new and discrete act of discrimination in the refusal to [reinstate] itself." *Id.*; *see also Poolaw v. City of Anadarko*, 660 F.2d 459, 465 (10th Cir. 1981) (employee's "allegation that his post-termination treatment was discriminatory is a claim separate and distinct from his allegation of discriminatory discharge").

Applying those principles to Kaufman's case, I believe Kaufman *would* be able to assert a viable retaliation claim based on EPA's denial of reinstatement if he could establish that the refusal was itself motivated by retaliatory intent. For instance, if Kaufman could show that the new EPA Administrator had reversed other personnel decisions made under her predecessor, and if Kaufman could further show that the Administrator refused to reinstate Kaufman because of his whistleblowing activities, Kaufman's retaliation claim might well succeed. By contrast, if EPA declined to reconsider the merits of the December 2000 Fields memorandum because it adhered to prior personnel decisions as a matter of policy, the refusal to reinstate Kaufman in the spring of 2001 presumably would not be a discrete retaliatory act. As I see it, this case therefore comes down to whether the Department of Labor, as the agency that adjudicated Kaufman's claims, afforded adequate consideration

to Kaufman's argument that EPA refused to reinstate him for retaliatory reasons.

In the proceedings before the ALJ, Kaufman alleged that EPA *did* reconsider the merits of the December 2000 decision and that its refusal to reinstate him was retaliatory in its own right. EPA, for its part, argued that it "simply reiterated" the December 2000 decision without ever revisiting it. Resp't Post-Hr'g Br. 3. The ALJ considered these arguments and credited EPA's version of events. *See* ALJ's Decision & Order at 43 (finding that EPA's actions with respect to Kaufman in March 2001 and thereafter were "the consequences of Fields' December memo precluding Kaufman from performing the Ombudsman duties"). The ALJ's conclusion is supported by substantial evidence and provides a sufficient basis for upholding the Department of Labor's decision.

At times, however, the ALJ suggested that EPA's refusal to reinstate Kaufman in the spring of 2001 was not "adverse" to him, and the ARB affirmed the ALJ with little independent analysis. While those references, for the reasons explained, introduced unnecessary confusion into the case, "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *accord Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 273 (D.C. Cir. 2007) (per curiam) ("Although FERC's wording may have been less than precise on this point, the agency's path may reasonably be discerned . . . .") (internal quotation marks omitted); *Nat'l Treasury Emps. Union v. FLRA*, 835 F.2d 1446, 1450 n.4 (D.C. Cir. 1987) (denying petition for review where "the substantive thrust of our reasoning accords with that of the [agency]"). Accordingly, my own view is that, with respect to the claims concerning EPA's refusal to reinstate Kaufman in the spring of 2001, the petition for review should be denied because Kaufman

has failed to show that EPA's proffered reason for its refusal adherence to the prior personnel decision was pretext for retaliatory animus. I would *not* hold, however, that Kaufman "failed to demonstrate that [the refusals to reinstate him] were adverse." *Ante*, at 18.

Nor, finally, would I hold that Claims 2 through 6, concerning EPA's challenged March-May 2001 actions, "were barred by the relevant statutes of limitation." *Id.* at 2. There is no contention that Kaufman filed (or amended) his complaint more than 30 days after the allegedly retaliatory actions about which he complains. Claims 2 through 6 all refer to events on or after March 5, 2001, and Kaufman filed his first complaint on April 3. As a matter of straightforward arithmetic, Kaufman's claims face no limitations bar. His claims may be unmeritorious, but they are not untimely. And those two questions should be kept distinct in light of the particular interest in maintaining a straightforward approach when addressing statutes-of-limitations questions at the threshold. *See, e.g.*, *Gonzalez v. Thaler*, 132 S. Ct. 641, 655 (2012); *Wilson v. Garcia*, 471 U.S. 261, 275 (1985).

The majority states that, if a refusal to reinstate can "commence the rerunning of the statute of limitations" in the circumstances of this case, that "would effectively write the statutes of limitations out of the law." *Ante*, at 18. I respectfully disagree. Many circuits recognize that the denial of reinstatement is independently actionable if motivated by discriminatory or retaliatory bias, *see Josephs*, 443 F.3d at 1060, and there is no indication that courts in those circuits have been deluged with claims concerning long-ago events. It is true that a terminated employee cannot "revive a barred claim simply by asking, 'Am I still fired?'" *Ante*, at 18. An employee could not get past the limitations bar by attempting to "revive a barred claim," but instead would need to raise a *new* claim alleging *new*

discrimination connected to a *new* action (that of denying reinstatement). An employee who can do so should be permitted to proceed. If his employer refused to reinstate him for reasons proscribed by Congress, the fact that he had already suffered an adverse action at some previous point should pose no limitations bar against his bringing a new claim based on the new discriminatory or retaliatory act. That is what Kaufman attempts to do here. His claims fail on the merits for the reasons explained, but not for failure to bring them on time.